# FOSTER-FOUNTAIN PACKING COMPANY ET AL v. HAYDEL.

No. 68. Argued April 18, 1928.—Decided October 15, 1928.

1

2

*Messrs. William H. Watkins* and *W. Lee Guice,* with whom *Mr. Gustave Lemle* was on the brief, for appellants.

*Messrs. Michael M. Irwin* and *John Dymond, Jr.,* with whom *Messrs. Percy Saint,* Attorney General of Louisiana, *Peyton R. Sandoz,* Assistant Attorney General, *A. Giffen Levy,* and *Leander H. Perez* were on the brief, for appellees.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Appellants, plaintiffs below, are engaged in the business of catching and canning shrimp for shipment and sale in interstate commerce. Appellees, defendants below, are public officers in Louisiana charged with the duty of enforcing Act No. 103, known as the "Shrimp Act," passed in July, 1926; so far as material here, it is printed in the margin.* Plaintiffs sued to enjoin enforcement of certain

---

* "AN ACT

" To declare all shrimp and parts thereof in the waters of the State to be the property of the State of Louisiana, and to provide the manner and extent of their reduction to private ownership; to encourage, protect, conserve, regulate and develop the shrimp industry of the State of Louisiana. . . .

" Section 1. . . . That all salt water shrimp existing in the waters of this State, and the hulls and all parts of said salt water shrimp shall be and are hereby declared to be the property of the State; until the title thereto shall be divested in the manner and form herein authorized and shall be under the exclusive control of the Department of Conservation of the State of Louisiana, until the right of private ownership shall vest therein as herein provided, and that no person, firm or corporation shall catch or have in their possession, living or dead, any salt water shrimp, or parts thereof, or purchase, sell or offer for sale, any such shrimp or parts thereof, after the same have been caught except as otherwise permitted herein.

of its provisions on the ground, among others, that they violate the commerce clause of the Federal Constitution. The district judge granted a restraining order pending application for a temporary injunction. There was a hearing before the court, consisting of three judges, organized as required by § 266 of the Judicial Code, U. S. C., Tit. 28 § 380; it set aside the restraining order and denied the injunction. Then the court allowed this appeal, found that the plaintiffs will sustain irreparable harm and damage, and stayed the enforcement of the Act pending determination here.

The case has not been tried and the sole question is whether, having regard to the particular facts and circumstances, the lower court's refusal to grant a temporary injunction was contrary to some rule of equity or the re-

---

" Section 4. That the right to take salt water shrimp from the waters of this State and the right to can, pack or dry the said shrimp when caught are hereby granted to any resident of this State, to any firm or association composed of residents of this State, or to any corporation domiciled in or organized under the laws of this State, operating a canning or packing factory or drying platform in this State. These rights shall be confined to such persons and corporations and are granted subject to the further conditions hereinafter stipulated. . . .

" Section 13. All salt water shrimp and the shells or hulls and heads of all salt water shrimp are hereby declared to be the property of the State, and the shells or hulls and heads to be valuable for use as a natural resource of the State as a fertilizer in the State; and it shall therefore and hereafter be unlawful to export from the State of Louisiana any salt water shrimp from which the shell or hull and head shall not have been removed.

" In order that all of the inhabitants of the State of Louisiana may enjoy the State's natural food product, it shall be lawful to ship unshelled shrimp from any point in the State of Louisiana to any other point in the State of Louisiana for edible consumption, subject to such regulations and restrictions as may be imposed by the Department of Conservation. Any person, firm or corporation of this State who shall lawfully take any shrimp from any waters of the State, or lawfully acquire the same, shall have a qualified interest or property

sult of improvident exercise of judicial discretion. *Meccano, Ltd.*, v. *John Wanamaker*, 253 U. S. 136, 141.

A brief statement of the allegations of the complaint follows:

The Foster Company is a Louisiana corporation and operates a shrimp hulling plant in that State. It gets shrimp from the tidal waters in the " Louisiana Marshes." The Sea Food Company is a Mississippi corporation and cans and packs shrimp in its plant at Biloxi in that State. Its product is shipped and sold in interstate commerce. The Foster Company and the Sea Food Company have a contract by which the former agrees to catch in Louisiana waters and deliver to the latter in Biloxi a carload of raw shrimp per month during specified periods. The sup-

---

in the shrimp so taken or acquired in the shells, which qualified interest may be sold or transferred to any other person, firm or corporation within the limits of the State; and after the edible portions of the abdomen popularly called the tail meat of said shrimp shall have been removed from the shell, within the State of Louisiana, such lawful taker or possessor, his heirs or assigns, as the case may be, shall be vested with all of the rights and property of the State in and to said shrimp tail meat and shall have the right to sell such shrimp tail meat or ship the same beyond the limit of the State, without restriction or reservation.

" It shall be the duty of all licensees operating under the Department of Conservation in the shrimp industry in this State to conserve for fertilizer purposes all shells or hulls and heads of salt water shrimp and to report monthly, on blanks to be furnished by the Department of Conservation, the quantity thereof on hand, to the Department of Conservation. It shall be unlawful to export from the State of Louisiana any raw shells or hulls and heads of salt water shrimp as they are required to be manufactured into fertilizer or used for an element in chicken feed. When the shrimp hulls or shells and heads shall have been conserved for the purposes herein stated, the right of property therein theretofore existing in the State shall pass to the lawful taker or the possessor thereof. Any person, firm or corporation violating the provisions of this section shall be liable to the penalties hereinafter imposed."

ply is intended for the interstate and foreign business of the Sea Food Company; and, if prevented from obtaining such shrimp, the business of that company will be destroyed and its plant will be of no value.

There are located at Biloxi plants comprising about one-fourth of the shrimp canning industry in the United States. The waters of Mississippi do not contain an adequate supply of shrimp and practically all that are packed there come from the Louisiana Marshes. Shrimp are taken by nets dragged by power boats, and are then put on larger vessels and transported to Biloxi. To prepare the meat for canning, the heads and hulls are picked off; most of them are thrown into the water where they are consumed by scavengers of the sea. But some are made into " shrimp bran," which is used to a small extent in the manufacture of commercial fertilizer.

The Act declares all shrimp and parts thereof in Louisiana waters to be the property of the State, and regulates their taking and reduction to private ownership. It grants the right to take, can, pack and dry shrimp to residents and also to corporations, domiciled or organized in the State, operating a canning or packing factory or drying platform therein. § 4. It is made unlawful to export from the State any shrimp from which the heads and hulls have not been removed. But, in order that all its inhabitants " may enjoy the State's natural food product," the Act declares it lawful to ship unshelled shrimp to any point within the State. Whoever shall lawfully take shrimp from the waters is granted a qualified interest which may be sold within the State. And, when the tail meat is removed within the State, the taker or possessor has title and the right to sell and ship the same " beyond the limit[s] of the State, without restriction or reservation." It is declared unlawful to export from the State any raw shells or hulls and heads " as they are required to be manufactured into fertilizer or used for an element

in chicken feed." But, when they have been " conserved for the purpose herein stated, the right of property therein theretofore existing in the State shall pass to the lawful taker or the possessor thereof." § 13. Penalties are prescribed for violations. § 19.

And the complaint alleges that for years shrimp taken from Louisiana waters have been shipped out of the State unshelled; that only a negligible amount of hulls and heads of such shrimp as are consumed within the State has ever been used as fertilizer; that the declared purpose to conserve them is a subterfuge. And plaintiffs state that, notwithstanding their willingness to pay all charges, licenses and taxes imposed and to comply with all the valid requirements, defendants, if not enjoined, will prevent plaintiffs from taking or acquiring shrimp from Louisiana waters to their great and irreparable loss.

At the hearing on their motion for a temporary injunction, plaintiffs presented affidavits which tend to show the facts following. By reason of favorable topographical, climatic, labor and other conditions, shrimp taken from the Louisiana Marshes may be more conveniently and economically canned at Biloxi than in Louisiana near to the source of supply. The Biloxi plants have long constituted an important center of the industry, and they are largely dependent upon the Louisiana Marshes for their supply. The enforcement of the Act would injure or destroy the shrimp business of plaintiffs and the industry at Biloxi. About 95 per cent. of the shrimp obtained from the waters of Louisiana, when taken, is intended for consumption outside the State. Some shrimp bran is made from the hulls and heads in Louisiana; but all of it is shipped to Biloxi where it is used to make fertilizer. It is worth less than one per cent. of the value of the shrimp. Not more than half the hulls and heads removed in Louisiana is used for any purpose. They have no market value, cannot be sold or given away, and often constitute a nuisance.

The facts alleged in the complaint, the details set forth in plaintiffs' affidavits and the provisions of the Act to be restrained show that the conservation of hulls and heads is a feigned and not the real purpose. They support plaintiffs' contention that the purpose of the enactment is to prevent the interstate movement of raw shrimp from the Louisiana Marshes to the plants at Biloxi in order through commercial necessity to bring about the removal of the packing and canning industries from Mississippi to Louisiana. The conditions imposed by the Act upon the interstate movement of the meat and other products of shrimp are not intended, and do not operate, to conserve them for the use of the people of the State.

One challenging the validity of a state enactment on the ground that it is repugnant to the commerce clause is not necessarily bound by the legislative declarations of purpose. It is open to him to show that in their practical operation its provisions directly burden or destroy interstate commerce. *Minnesota* v. *Barber,* 136 U. S. 313, 319. *Brimmer* v. *Rebman,* 138 U. S. 78, 81. In determining what is interstate commerce, courts look to practical considerations and the established course of business. *Swift and Co.* v. *United States,* 196 U. S. 375, 398. *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50, 59. *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 309. *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189, 198, 200. Interstate commerce includes more than transportation; it embraces all the component parts of commercial intercourse among States. And a state statute that operates directly to burden any of its essential elements is invalid. *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 290. *Shafer* v. *Farmers Grain Co., supra,* 199. A State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State. *Penna.* v. *West Vir-*

*ginia,* 262 U. S. 553, 596. *Oklahoma* v. *Kansas Nat. Gas Co.,* 221 U. S. 229, 255.

The authority of the State to regulate and control the common property in game is well established. *Geer* v. *Connecticut,* 161. U. S. 519, and cases cited at p. 528. These and many other cases show that the State owns, or has power to control, the game and fish within its borders not absolutely or as proprietor or for its own use or benefit but in its sovereign capacity as representative of the people. In *Geer* v. *Connecticut* the Court, speaking through Mr. Justice White, said (p. 529): " Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the State, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government, as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the State, as held by this Court. in *Martin* v. *Waddell,* 16 Pet. [367] 410, represents its people, and the ownership is that of the people in their united sovereignty." In *Lacoste* v. *Dept. of Conservation, La.,* 263 U. S. 545, we said (p. 549): " The wild animals within its borders are, so far as capable of ownership, owned by the State in its sovereign capacity for the common benefit of all its people. Because of such ownership, and in the exercise of its police power, the State may regulate and control the taking, subsequent use and property rights that may be acquired therein."

Defendants rely on *Geer* v. *Connecticut* to sustain their contention that the Act forbidding the shipping of raw and unshelled shrimp out of the State was not in conflict with the commerce clause. The statute of Connecticut

declared it unlawful to kill or possess any woodcock, ruffled grouse, or quail for transportation, or to transport them, beyond the limits of the State. The question was whether the State had power to regulate the killing of game so as wholly to confine its use within the limits of the State. No part of the game was permitted by the statute to become an article of interstate commerce. The Court said (p. 529) that the sole consequence of the provision was " to confine the use of such game to those who own it, the people of that State " and that (p. 530) " in view of the authority of the State to affix conditions to the killing and sale of game . . . it may well be doubted whether commerce is created by an authority given by a State to reduce game within its borders to possession, provided such game be not taken, when killed, without the jurisdiction of the State. . . . Passing, however, as we do, the decision of this question, and granting that the dealing in game killed within the State . . . created internal State commerce, it does not follow that such internal commerce became necessarily the subject-matter of interstate commerce, and therefore under the control of the Constitution of the United States. . . . (p. 532). The fact that internal commerce may be distinct from interstate commerce, destroys the whole theory upon which the argument of the plaintiff in error proceeds."

But that case is essentially unlike this one. The purpose of the Louisiana enactment differs radically from the Connecticut law there upheld. It authorizes the shrimp meat and bran, canned and manufactured within the State, freely to be shipped and sold in interstate commerce. The State does not require any part of the shrimp to be retained for consumption or use therein. Indeed only a small part is consumed or needed within the State. Consistently with the Act all may be, and in fact nearly all is, caught for transportation and sale in interstate

commerce. As to such shrimp the protection of the commerce clause attaches at the time of the taking. *Dahnke-Walker Co.* v. *Bondurant, supra. Penna* v. *West Virginia, supra* 596, *et seq.* As the representative of its people, the State might have retained the shrimp for consumption and use therein. But, in direct opposition to conservation for intrastate use, this enactment permits all parts of the shrimp to be shipped and sold outside the State. The purpose is not to retain the shrimp for the use of the people of Louisiana; it is to favor the canning of the meat and the manufacture of bran in Louisiana by withholding raw or unshelled shrimp from the Biloxi plants. But by permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the State necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control. Clearly such authorization and the taking in pursuance thereof put an end to the trust upon which the State is deemed to own or control the shrimp for the benefit of its people. And those taking the shrimp under the authority of the Act necessarily thereby become entitled to the rights of private ownership and the protection of the commerce clause. They are not bound to comply with, or estopped from objecting to the enforcement of, conditions that conflict with the Constitution of the United States. *Quaker City Cab Co.* v. *Pennsylvania,* 277 U. S. 389. *Power Co.* v. *Saunders,* 274 U. S. 490, 493, 497. *Hanover Insurance Co.* v. *Harding,* 272 U. S. 494, 507.

If the facts are substantially as claimed by plaintiffs, the practical operation and effect of the provisions complained of will be directly to obstruct and burden interstate commerce. *Penna* v. *West Virginia, supra. Oklahoma* v. *Kansas Nat. Gas Co., supra.* The affidavits give substantial and persuasive support to the facts alleged. And as, pending the trial and determination of the case,

14

plaintiffs will suffer great and irremediable loss if the challenged provisions shall be enforced, their right to have a temporary injunction is plain. From the record it quite clearly appears that the lower court's refusal was an improvident exercise of judicial discretion.

*Decree reversed.*

Separate opinion of MR. JUSTICE MCREYNOLDS.

I think the court below properly applied the correct doctrine and that the challenged decree should be affirmed.

In *Geer* v. *Connecticut,* 161 U. S. 519, 529, 534, this Court upheld legislation by the State which permitted woodcock, ruffled grouse and quail to be killed for transportation and sale within her borders, but forbade the killing or possession of such birds when dead for transportation to other States. It accepted the rule relative to dominion over animals *ferae naturae* as stated in *Ex parte Maier,* 103 Calif. 476, [483]—

" The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good."

And commenting upon certain opinions which denied the validity of statutes whereby shipments of game beyond the State were prohibited, it said—" . . . but the reasoning which controlled the decision of these cases is, we think, inconclusive, from the fact that it did not consider the fundamental distinction between the qualified ownership in game and the perfect nature of ownership in other property, and thus overlooked the authority of the State over property in game killed within its con-

fines, and the consequent power of the State to follow such property into whatever hands it might pass with the conditions and restrictions deemed necessary for the public interest."

Manifestly, Louisiana has full power absolutely to forbid interstate shipments of shrimp taken within her territory. These crustaceans belong to her and she may appropriate them for the exclusive use and benefit of citizens. If the State should conclude that the best interests of her people require all shrimp to be canned or manufactured therein before becoming part of interstate commerce, nothing in the Federal Constitution would prevent appropriate action to that end. This would not interfere with any right guaranteed to an outsider. How wild life may be utilized in order to advantage her own citizens is for the producing State to determine. To enlarge opportunity for employment is one way, and often the most effective way, to promote their welfare.

Certainly, I cannot accept the notion that the record discloses any subterfuge—something resorted to for concealment—by Louisiana. And I think no weight should be given to the gratuitous allegation of such purpose by non-residents who are seeking to defeat control by the State in order that they may secure benefits for themselves from wild life found therein.

Any profitable discussion of this controversy must take into consideration the marked distinction between game and property subject to absolute ownership. Cases like *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, which concern property of the latter kind are not persuasive here. A State may regulate the sale and transportation of wild things in ways not permissible where wheat is the subject matter. *Geer* v. *Connecticut, supra; Silz* v. *Hesterberg,* 211 U. S. 31, 41; *Clark Distilling Co.* v. *Western Maryland Ry.,* 242 U. S. 311.