**GULF OIL CORPORATION, a corporation, Plaintiff,**

v.

**CORPORATION COMMISSION OF The STATE OF OKLAHOMA; Ray C. Jones, Wilburn Cartwright, and Harold Freeman, as Members of said Corporation Commission and as Individuals, Defendants.**

**Civ. A. No. 7147.**

United States District Court
W. D. Oklahoma.
Dec. 19, 1956.

James B. Diggs, Jr., and Roger K. Allen, Tulsa, Okl., for plaintiff.

Ferrill H. Rogers, Asst. Consultation Atty., Corp. Commission of Oklahoma, Okl., Charles Nesbitt, Oklahoma City, Okl., Richard Maurice Huff, Asst. Atty. Gen. of Oklahoma, and Mosteller, Fellers, Andrews & Loving, Oklahoma City, Okl.

Before MURRAH, Circuit Judge, and CHANDLER and WALLACE, District Judges.

WALLACE, District Judge.

The plaintiff, Gulf Oil Corporation, a Pennsylvania corporation, (herein referred to as "Gulf") brings this action against the Corporation Commission of the State of Oklahoma, Ray C. Jones, Wilburn Cartwright, and Harold Freeman, as Members of said Corporation Commission and as Individuals (herein referred to as "Commission") to enjoin an order entered by the Commission on or about June 29, 1956, requiring purchasers of crude oil produced in Oklahoma to purchase the full allowable fixed by the Commission for oil wells from which the purchasers take oil, unless the Commission specifically grants permission to take a lesser amount.[1] At the time of hearing the court took under advisement defendant's motion to dismiss; and, for the convenience of the parties permitted the introduction of evidence going toward the merits of the case.

The complainant urges that this court has jurisdiction by virtue of complete diversity of citizenship and because of requisite amount;[2] and, has called upon this three-judge court inasmuch as injunctive relief against the enforcement of a state law is requested.[3] The defendants concede that the *bare* jurisdictional requirements of the relied upon statutes exist, but challenge this court's right to consider this cause on its merits due to plaintiff's failure to exhaust all administrative remedies and further because of the lack of *equity* jurisdiction.

There is no substance to defendants' assertion that Gulf has failed to exhaust all necessary administrative remedies prior to the filing of this complaint. Admittedly, Gulf has neither specifically requested the Commission to grant a special exemption as available under the terms of the controverted Paragraph 26 of the Market Demand Order, nor taken a direct appeal from this order of the Commission to the State Supreme Court. However, no such special request by Gulf

---

1. The contested order is the last provision of the oil allowable order for the months of July-August, 1956, entered on or about June 29, 1956, which provides: "It is therefore ordered by the Corporation Commission of Oklahoma as follows: * * * 26. That all takers and/or purchasers of crude oil in Oklahoma shall take the full amount of oil allowed by this order unless relieved therefrom by this Commission after notice and hearing as provided by law."

2. See 28 U.S.C.A. § 1331.

3. See 28 U.S.C.A. § 2281.

was needed to exhaust its administrative remedy. Although the controverted order contains a provision that exemptions from the order's terms may be obtained, Gulf has no special cause to claim exemption other than the fact that it is an interstate purchaser. And, on August 21, 1956, at a Commission hearing, Gulf pointed out this interstate condition and requested that purchasers falling in such category be exempted as a class. Subsequently, the order was issued omitting any such exception. Thus, the Commission unmistakably indicated it intended to affect interstate purchasers as well as local purchasers by such order, and, Gulf claims no other special right entitling it to relief.

The Oklahoma law is amply clear that a party aggrieved has the right to directly appeal to the Oklahoma Supreme Court from a contested order, such as the one in view, without first moving for a new trial or pursuing other special provisions for relief;[4] and, that such an appeal is judicial in character and not administrative.[5] Thus, in those cases wherein the federal court does have jurisdiction no claim can properly lie that the administrative remedy has not been exhausted, since any consideration by the Oklahoma court is at such juncture *judicial* and not administrative in nature.[6]

We now turn to the more serious question of whether *equity* jurisdiction lies.

The defendants urge that the instant case falls clearly within the purview of that doctrine which requires deference by the federal judiciary to local forums thus granting local processes the opportunity to resolve the controversy without a needless calling into play of federal constitutional problems.[7] Gulf, although recognizing the doctrine of abstention asserts that the case before us is not one calling for the application of such doctrine inasmuch as the contested order shows on its face that judged by federal constitutional principles the order invades the exclusive province of federal authority.[8] Specifically, Gulf argues that the Commission has attempted to regulate the volume of crude oil purchases in interstate commerce contrary to the Interstate Commerce Clause of the Constitution, art. 1, § 8, cl. 3, and the Due Process Clause of the Fourteenth Amendment; and, that the Commission's attempted action is not merely the invalid exercise of an admitted power, but is an attempted assertion of authority expressly and wholly denied by federal law.

In urging equity jurisdiction Gulf principally relies upon the cases of Texoma Natural Gas Co. v. Railroad Commission of Texas,[9] and Thompson v. Consolidated Gas Utilities Corporation.[10] In both these cases three-judge courts granted injunctive relief against the enforcement of local orders. In the Texoma Natural Gas Company case the court held that the Texas Act, Vernon's Ann. Civ.St. art. 6049a, requiring both common and private pipe line carriers to purchase gas without discrimination between producers was an unconstitutional taking of private property for public use without just compensation; and, that in addition there was an unconstitutional interference with and burden upon inter-

---

4. See Holzbierlein v. State, 1946, 197 Okl. 509, 172 P.2d 1007; Republic Natural Gas Company v. State, 1947, 198 Okl. 350, 180 P.2d 1009; and, Mee v. Corporation Commission, Okl.1956, 293 P.2d 593.

5. See Sterling Refining Company v. Walker, 1933, 165 Okl. 45, 25 P.2d 312; and, Art. IX, § 20, Okl.Const.

6. Bacon v. Rutland R. Co., 1914, 232 U.S. 134, 34 S.Ct. 283, 58 L.Ed. 538.

7. This doctrine of "abstention" for equitable reasons was applied in Alabama Public Service Comm. v. Southern Ry. Co., 1951, 341 U.S. 341, 71 S.Ct. 762, 95 L. Ed. 1002. Also, see Public Service Comm. of Utah v. Wycoff Co., Inc., 1952, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291; and Railroad Commission of Texas v. Pullman Co., 1946, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.

8. See Public Utilities Commission of Ohio v. United Fuel Gas Co., 1943, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396.

9. D.C.Tex.1932, 59 F.2d 750.

10. 1936, 300 U.S. 55, 57 S.Ct. 364, 81 L. Ed. 510.

state commerce. And, in the Thompson case, the law under attack was found constitutionally deficient inasmuch as it was enacted solely to compel private pipe line owners to furnish a market to those who had no pipe line connections. However, two pivotal features distinguish the Texoma Natural Gas Company case from the one before us. There, the plaintiffs were *private* pipe line carriers who were solely devoted to serving their own privately owned wells and had not dedicated their property to public use. Moreover, while the litigated act purported to conserve oil and gas as natural resources of the state, it was conceded that the pipe line operations therein did not result in waste. And, in the Thompson case it was obvious from the face of the order that the exercised authority was neither related to the prevention of waste nor the protection of correlative rights in connection with undue drainage.

In the instant case, Gulf, under Oklahoma law, is a common carrier and common purchaser and is under a public duty, as any other common carrier, to furnish adequate facilities.[11] It is in relation to this duty along with the state's legitimate interest in ratable taking (and conservation) that the countenance of the questioned order must be judged.

Unquestionably, the transactions covered by the controverted order bear some real relationship to interstate commerce.

However, such does not alter the fact that the subject matter of this order is of a dominant local character and involves local law.[12] Significantly local authorities, in the absence of a clearly defined pre-emption to the federal government, have the right to affect interstate commerce in the absence of placing an unreasonable burden thereon; and, this order cannot be deemed invalid on its face merely because interstate commerce is touched.[13] Moreover, the doctrine of abstention is not precluded from application merely because the constitutional issue arises in connection with the commerce clause.[14] As recognized in Gulf's own brief, for this court to exercise its jurisdiction it must appear from the face of the contested order itself that there has been an attempt by local officials to exercise a federally pre-empted power, as distinguished from a mere invalid or abusive use of legally possessed state authority. And, the mere statement of this test seems conclusive as to the need of this court to defer to the local forums in the instant suit. In this case it is impossible to separate the claims of constitutional infringement from questions involving interpretation of Oklahoma law; and, the order even if ultimately held invalid under the Oklahoma law, by all reasonable standards is rationally related to express authority held by the Commission to protect cor-

11. See in particular 52 Okl.Stat. § 56.

12. It is apparent that to prevent discriminatory and inequitable taking a state must be able to have some regulation over the taking along with the production, and have some control over the taker as well as the operator. And, as observed in the dissenting opinion in Republic Natural Gas Co. v. State of Oklahoma, 1947, 334 U.S. 62, 95, 68 S.Ct. 972, 990, 92 L. Ed. 1212, the authority of the state does not spring exclusively from the interest to preserve the natural resources but "It stems rather from the basic aim and authority of any government which seeks to protect the rights of its citizens and to secure a just accommodation of them when they clash."

13. "The Commerce Clause gives to the Congress a power over interstate com-

merce which is both paramount and broad in scope. But due regard for state legislative functions has long required that this power be treated as not exclusive. [Citing authority] * * * It is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce. * * * " Cities Service Gas Co. v. Peerless Oil & Gas Co., 1950, 340 U.S. 179, 186, 71 S.Ct. 215, 219, 95 L.Ed. 190.

14. Railroad Commission of Texas v. Pullman Company, footnote 7, supra; Natural Gas Pipeline Company v. Slattery, 1937, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276; Spector Motor Service v. McLaughlin, 1944, 323 U.S. 101, 65 S.Ct. 152, 89 L. Ed. 101.

relative rights, and cannot be deemed merely an attempt to usurp authority in a field exclusively delegated to the federal government.[15]

The most recent application of the doctrine of abstention, embracing facts analogous to the instant case, is found in two companion Kansas cases.[16] In these cases Sinclair Pipe Line Company and Sinclair Crude Oil Company asked the Federal District Court of Kansas to pass upon the constitutionality of an order issued by the Kansas Corporation Commission prohibiting the sale of a portion of an interstate pipe line system. In urging jurisdiction the plaintiffs therein argued that the Kansas Conservation Law did not pretend to confer authority upon the Commission to regulate the sale of interstate pipe line systems, or any parts thereof, and that if the local law so attempted it was in conflict with the Federal Constitution. However, even in the face of such allegations the three-judge court of Kansas refused to accept jurisdiction inasmuch as a "definitive ruling on the state law might make unnecessary the determination of the federal constitutional questions"; and the court quoted from Public Utilities Commission v. United Fuel Gas Company wherein the Supreme Court noted that "Where the disposition of a doubtful question of local law might terminate the entire controversy and thus make it unnecessary to decide a substantial constitutional question, considerations of equity justify a rule of abstention." [17] In addition, the Kansas court recognized that the Kansas procedure provided a speedy method of obtaining review.[18]

The logic of the Sinclair cases, is equally applicable here. A speedy method of review is available through Oklahoma forums;[19] and, a resort to such avenues may entirely eliminate the grave constitutional issues now asserted. Obviously, if the state authorities do not properly protect rights of the plaintiff springing from the Federal Constitution, Gulf can assert such rights directly to the United States Supreme Court from the Supreme Court of Oklahoma.

The defendants' Motion to Dismiss is hereby sustained.

CHANDLER, Justice (concurring).

I concur in the result reached by Judge Wallace. However, I am of the opinion that Gulf has not exhausted all necessary administrative remedies. It has not applied for relief under Paragraph 26 of the Corporation Commission order. For that reason the complaint should be dismissed.

Had all administrative remedies been exhausted without success, I agree with Judge Wallace that this Court should not assume equity jurisdiction. Gulf has not shown that the Oklahoma procedure for review of the contested order is in any way inadequate to preserve for ultimate review by the Supreme Court of the United States any federal question arising out of the order. As a matter of fact adequate and speedy remedy would be available by appeal to the Supreme Court of Oklahoma and thence to the Supreme Court of the United States. The power of a court of equity to act being

15. Thus distinguish our suit from Public Utilities Commission of Ohio v. United Fuel Gas Co., footnote 8, supra, at pages 469, 463, 63 S.Ct. at pages 376, 373, wherein the court ruled that "the orders of the state Commission are on their face plainly invalid" because in conflict with the federal natural gas act; and "no state court ruling on local law could settle the federal questions that necessarily remain".

16. These cases are Sinclair Pipe Line Company v. Snyder (Sinclair Crude Oil Company v. State Corporation Commis-

sion of State of Kansas), D.C.Kan.1956, 147 F.Supp. 632.

17. Footnote 8, supra, 317 U.S. at page 463, 63 S.Ct. at page 373.

18. Cf. language of Burford v. Sun Oil Company, 1942, 319 U.S. 315, 325.

19. Under 52 Okl.Stat. § 112 any person affected by a Commission order may at any time apply for repeal, amendment, or modification; and, such application is to be given expeditious hearing. If the requested relief is denied, then a direct appeal lies to the Oklahoma Supreme Court.

discretionary, the controlling principle announced in Alabama Public Service Commission v. Southern Railway Company, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002, places upon us a duty to abstain under these circumstances.

MURRAH, Justice (dissenting).

At the outset, let me acknowledge and embrace the doctrine of abstention, applicable in cases of this kind, to the effect that a federal court will refrain from exercising its equity jurisdiction to enjoin the enforcement or operation of a state statute or a regulatory order of a state tribunal, to vouchsafe the due process or equal protection guaranties of the Fourteenth Amendment.

The doctrine has been readily applied to challenged state statutes and regulatory orders in the exercise of the state police power to regulate the exploration, production and marketing of petroleum products found and produced within the boundaries of a state. Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Champlin Refining Co. v. Corporation Commission of State of Oklahoma, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 311 U.S. 570, 61 S.Ct. 343, 85 L.Ed. 358; Natural Gas Pipeline Co. of America v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276. These are matters deemed primarily of internal concern within the peculiar competence of state regulatory bodies with adequate recourse to the state courts and to the Supreme Court for redress of asserted deprivation of due process and equal protection of the laws.

The doctrine reached full fruition and vitality in Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 768, 95 L.Ed. 1002, the court saying, "Equitable relief may be granted only when the District Court, in its sound discretion exercised with the 'scrupulous regard for the rightful independence of state governments which should at all times actuate

the federal courts,' is convinced that the asserted federal right cannot be preserved except by granting the 'extra-ordinary relief of an injunction in the federal courts.'" Indeed, the latter case is said to have the practical effect of foreclosing federal equity jurisdiction to vouchsafe economic due process or equal protection "if a plaintiff can be sent to a state court to challenge an agency order." See Mr. Justice Frankfurter dissenting, 341 U.S. at page 356, 71 S.Ct. at page 771.

But that notion was apparently repudiated in Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 492, the court denying that it had ever "held that a district court is without jurisdiction to entertain a prayer for an injunction restraining the enforcement of a state statute on the grounds of alleged repugnancy to the Federal Constitution simply because the state courts had not yet rendered a clear or definitive decision as to the meaning or federal constitutionality of the statute." For that matter, three-judge federal equity jurisdiction has always been deemed a ready forum for the asserted deprivation of civil rights under the Fourteenth Amendment. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628; Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; and related cases; McLaurin v. Oklahoma State Regents for Higher Ed., 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149; Stapleton v. Mitchell, D.C., 60 F.Supp. 51. In the determination of the appropriateness of the exercise of federal equity jurisdiction, the courts seem, however, to recognize a clear distinction between economic and human due process and equal protection. "Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard." West Virginia State Board of Education v. Barnette, supra, [319 U.S. 624; 63 S.Ct. 1186].

If only due process and equal protection were involved, I should not hesitate to relegate the plaintiff to its remedy in the state court, for adequate judicial recourse from the challenged order to

the Supreme Court of Oklahoma is provided by the constitution and laws of Oklahoma. Art. IX, § 20, Constitution of Oklahoma, 52 O.S.A. §§ 111, 113. But, more is involved than asserted denial of due process of law. The principal complaint of Gulf is that the enforcement of the challenged order will immediately cast a discriminatory burden upon interstate commerce. It was this consideration which prompted us to overrule the motion to dismiss and hear evidence relevant to that issue.

Three-judge equity jurisdiction was cautiously sustained in Public Utilities Commission of Ohio v. United Fuel Gas Company, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396, where the challenged Commission order asserted jurisdiction to fix the rates for natural gas transported and sold in interstate commerce. After resolving preliminary questions of state law, the court rejected the Commission's power to establish reasonable rates for the gas sold in interstate commerce on the grounds that the federal government had preempted the field by the Natural Gas Act of 1938, 52 Stat. 821, 15 U.S.C.A. § 717. The court was careful, however, to point out that the Gas Company had exhausted all administrative remedies available to it before bringing the suit. And, it was also careful to note the absence of the necessity for considering whether the commerce clause of its own force invalidated the Commission's assertion of jurisdiction over the interstate gas rates.

Even in the absence of preempting federal legislation, three-judge equity jurisdiction was deemed proper to vindicate the supremacy of the interstate commerce clause as against state discrimination in Baldwin v. G. A. F. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032. And see also Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147; Lemke v. Farmers Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458.

To be sure, the exhaustion of all administrative remedies is requisite to the exercise of collateral jurisdiction, Natural Gas Co. v. Slattery, supra, and the Commission says that Gulf has not done so.

Paragraph 26 of the challenged order provides in effect that all takers and purchasers shall take the full allowable production "unless relieved" by the Commission after notice and hearing. Paragraph 40 of the order provides in part that "all takers and purchasers shall take the amount fixed in this order unless in an extreme emergency an application is filed for relief from that provision and permission is granted by the Corporation Commission to take less than the amount provided by this order, after notice and hearing * * *" Conceivably, the Commission might relieve Gulf of the requirements of the order upon a showing of an "extreme emergency". But, Gulf says that it has no grounds for exception; that no unusual circumstances exist to justify relief from the order. It is said to stand on the same footing with all other takers and purchasers with no grounds for relief except its inability to comply with the order. And this, the Commission says, is legally insufficient. These representations were made to the Commission and were before it when the challenged order was made. The only recourse to the Commission would be in the nature of a petition for rehearing and I do not understand such to be an administrative prerequisite to judicial inquiry. Republic Natural Gas Co. v. State, 198 Okl. 350, 180 P.2d 1009. It is also noteworthy that no questions of state law are involved, the construction and interpretation of which might obviate the necessity for decision on the constitutional question. Cf. Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876; Phillips Petr. Co. v. Jones, D.C.W.D.Okl. 147 F.Supp. 122; Sinclair Pipe Line Co. v. Snyder (Sinclair Crude Oil Co. v. State Corporation Commission), D.C.Kan., 147 F.Supp. 632.

Gulf does not challenge the power of the Commission under state law. The

gravamen of its complaint is that the order is proscribed by the supremacy of the commerce clause of the Federal Constitution. We are thus brought squarely to the question whether the commerce clause of the Constitution by its own naked force prohibits the challenged order. The resolution of that question depends on federal law, and while it may have been preferable to test the constitutionality of the order of a state agency first in the state courts with ultimate recourse to the supreme judge of federal law, the case is rightly here by constitutional choice of forums, and I do not think it would be in the public interest to send the plaintiff away without day.

We start with the proposition, about which there can be no dispute, namely, that the State of Oklahoma, through its Corporation Commission, is clothed with almost plenary power to promulgate measures for the conservation of its natural resources, and particularly the production, transportation and marketing of petroleum products. That power and authority, first vitalized in Ohio Oil Co. v. State of Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729, has been reaffirmed too many times to admit of debate. We know that the due process and equal protection clauses of the Constitution impose only tenuous restrictions upon the exercise of that power, and federal courts will rarely interfere on that ground where state remedies are provided. And see Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, and cases cited.

It is also noteworthy that a state may, consistently with the commerce clause of the Constitution, regulate its internal economy, including oil industry, even though such regulations have some substantial bearing on interstate commerce. It is now well settled that "a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce. * * * The only requirements consistently recognized have been that the regulation not discriminate against or place

an embargo on interstate commerce, that it safeguard an obvious state interest, and that the local interest at stake outweigh whatever national interest there might be in the prevention of state restrictions." Cities Service Co. v. Peerless Co., 340 U.S. 179, 71 S.Ct. 215, 219, 95 L.Ed. 190, and cases cited. See also Milk Control Board v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752; Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 85 L.Ed. 315; Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993.

Since Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996, first establishing the so-called "balancing of interest" principle in 1852, courts have been struggling with the perplexing problem of making pragmatic adjustments between competing local and national interests under the commerce clause. All agree to the proposition that the states are free to deal with the diverse activities primarily affecting local affairs so long as they do not reach out to regulate interstate commerce to the state's own economic advantages and to the detriment of the national interest. The contrariety comes from the divergence of views in each case concerning the dominant interest.

The principle is well illustrated by a unanimous court in Baldwin v. G. A. F. Seelig, supra. The philosophical cleavage is graphically illustrated in H. P. Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865, where the court, while agreeing upon the underlying principle, sharply disagreed upon its factual application. There, the bare majority, after threading the principle through case after case, struck down a health and safety measure of a New York administrative agency having for its purpose the protection of local milk markets against out-of-state competition despite the avowed health and safety motives. The court thought the obvious effect of the order was to foster economic rivalries and reprisals among states competing for the metropolitan milk market.

One sure conclusion emerges from the adjudicated cases, that is, whatever stand we take, we shall not stand alone. With these basic principles in mind, let us analyze the facts.

Gulf Oil Corporation produces oil in all or most of the mid-continent states, including Oklahoma. It purchases oil from 4882 producing leases, 1668 of which are in Oklahoma. It also repurchases oil gathered by other takers from other producing leases in the same area. Some of the repurchases are on a reciprocal contract letter basis, under which Gulf purchases stated amounts of oil in Oklahoma, and sells the same amount of oil to another purchaser in another state or the same state in order to facilitate economical transportation to market. All of the oil purchased by Gulf is transported by pipe line to its five refineries at Port Arthur, Texas, Philadelphia, Pennsylvania, New York, New York, Cincinnati, Ohio and Toledo, Ohio. All of the oil purchased in Oklahoma, including repurchases, is received immediately by the Gulf Refining Company, a wholly owned subsidiary, for transportation through its pipe line to its refineries near Cincinnati and Toledo. None of the oil is transported for delivery to Oklahoma points. Gulf Refining Company operates its pipe line system as an interstate pipe line common carrier of oil for hire, subject to the Federal Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and the rules and regulations of the Federal Interstate Commerce Commission issued pursuant thereto, 49 C.F.R., Parts 20, 120, 141, 142, 148, 155, 156, 158, 159, 160. All transportation of crude oil through this pipe line system to the Toledo and Cincinnati refineries is pursuant to tariffs filed by Gulf Refining Company with the Federal Interstate Commerce Commission, and is at the rates and subject to the rules and regulations set out in such tariffs.

Some of the oil purchased in Texas, New Mexico and Illinois is also transported immediately to the same refineries. No crude purchased from any other states or countries was received at these refineries during the period in question and the Ohio refineries are the only presently available markets for Oklahoma crude purchased or repurchased by Gulf. These Ohio refineries have been the only market for Oklahoma crude purchased by Gulf since 1952. Since that date, Gulf's purchases for those refineries have increased from 15,987 barrels to 38,348 barrels per day. The total purchases for the same refineries for the same date have increased from 66,924 barrels to 78,068 barrels per day. It is necessary to blend the Oklahoma crude with other crude of different gravity in order to bring it up to its optimum refining qualities. During all of the time in question, Gulf's purchases of Oklahoma crude have conformed to the production allowables fixed by the Oklahoma Corporation Commission, as well as the allowables fixed by the comparable commissions for the states of Texas, New Mexico, Louisiana and Kansas. And, compliance with the orders of the Commission applicable to July, August, September and October 1956 results in the purchase of between 24,000 and 26,000 barrels of oil per day. This is in excess of the market demand for Oklahoma crude at Gulf's only market and for some months has resulted in excessive top ground storage of crude in Gulf's facilities along the pipe line system.

Furthermore, the undisputed proof shows a current excess of supply over demand for crude oil nationally. There was expert and unchallenged testimony to the effect that 150,000,000 barrels of gasoline is the desirable amount of reserve stock, and that there is or was at the time of the hearing approximately 170,000,000 barrels of refined stock in top ground storage. There was undisputed expert proof to the effect that 250,000,000 barrels of crude oil is the desirable top ground storage to meet refinery needs and to take care of anticipated contingencies; that there is now or was at the time of the hearing approximately 280,000,000 barrels of oil in top ground storage. This top ground storage of

refined and crude stock is shown to be excessive and depressive upon the national market.

The net result of this evidence is that the several producing states are now competing for the limited market for crude oil. The crude oil production from prorated wells greatly affects the economy of the state, both private enterprise which produces it, and the State which taxes it. Oklahoma's market for the crude oil purchased and transported by Gulf is fixed and limited. It must compete with other states for the same market. When, in June 1956, the Corporation Commission came to determine market demand for the purpose of fixing allowables, it was informed by Gulf in response to the conventional invitation to nominate the amount of oil it would take that "unless the Commission takes action to reduce our runs at least to 19,500 barrels per day, we shall be compelled to take action ourselves. Assuming no action by the Commission effective seven a. m. July 1, 1956, our lease purchase in Oklahoma will be reduced to 75% of our actual average purchases for the month of May 1956. The effect of this will be to reduce our actual runs to 19,500 barrels per day during July 1956, the amount we have nominated and which we can handle." In the face of this nomination and representation, the Corporation Commission's order, effective July 1, 1956, for August, September and October 1956 fixed the allowables based upon Gulf's purchases for prior months.

The avowed purpose and effect of the challenged order is to prevent physical and economic waste, and it is argued that if the producers are able to sell only a part of the oil they can produce under the Commission's market demand orders, the result is economic waste, underground waste and surface waste; that marginal wells are rendered unprofitable and recoverable reserves lost; salt water wells and waterflood projects suffer injury, and perhaps destruction; and that other wells can be produced only at greater expense. It is said that producers must provide their own wasteful storage facilities at the lease or forever lose additional production; that underages are never caught up; the surplus oil must be disposed of at reduced prices; and the state suffers in loss of revenue from the impact on one of its most vital industries.

The Corporation Commission is undoubtedly empowered to fix a reasonable market demand based upon statutory factors, and it is not bound by the nominations of the takers and purchasers. See 52 O.S.A. § 110. Peppers Refining Co. v. Corporation Commission, 198 Okl. 451, 179 P.2d 899. But it is true, as the Commission's attorneys say, that "market demand for Oklahoma oil depends upon the market demand of the nation, and in turn of the world-wide supply and demand for petroleum and its products." In the exercise of its police power to secure co-equal and ratable taking between and within common sources of supply, the Commission may determine the reasonable market demand, but it cannot compel a purchaser to take oil for which it has no market if the result is to prejudice commerce in oil from other states competing for the same market.

There is no contention that Gulf will not take its reduced purchases ratably among its sources of supply, and certainly there can be no contention that the waste and deterioration will be any greater in the tanks of the producers than those of the purchasers. There was expert testimony to the effect that top ground storage of gasoline and crude results in qualitative and quantitative deterioration and waste, and that it creates other hazards which ought to be prevented. The net result of all of this is a coercive, even though laudable, attempt to preserve Oklahoma's market for its crude oil in competition with other states. The undisputed evidence is that if Gulf is required to take the full allowable, it must do one or all of four things, First, it may withdraw completely from the state with obvious disastrous consequences; second, reduce the number of leases from which it purchases in Oklahoma; third, it may cur-

tail its repurchases of Oklahoma crude with consequent adverse impact upon free interstate trade in oil; or, fourth, it may curtail its interstate purchases elsewhere in order to accommodate the purchase of Oklahoma allowables. To me, any alternative is to impose a restriction upon interstate commerce for the economic advantage of the State of Oklahoma. If Oklahoma can enforce its order to take more oil for interstate markets than the market demand therefor, other competing states can do likewise with chaotic and disruptive consequences to interstate commerce.

Our facts are not ruled by Cities Service Co. v. Peerless Co., supra, where the state fixed the price of natural gas sold in interstate commerce to prevent economic and physical waste. The impact of the order served a legitimate local interest without disruptive effect on interstate commerce. Nor is it like Parker v. Brown, supra; Milk Control Board v. Eisenberg Farm Products, supra; or Panhandle Eastern Pipeline Co. v. Michigan Public Service Commission, supra, where the local interest was dominant and the effect upon interstate commerce nondiscriminatory. In our case, the national interest is dominant. Like H. P. Hood & Sons v. Du Mond, supra; Baldwin v. G. A. F. Seelig, supra; Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329; and State of Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027, free and nondiscriminatory trade in interstate commerce is at stake. The constitutional limitations on the police power of the state to regulate the interstate transportation of petroleum products was very recently recognized in the Supreme Court of Kansas, the court pointing out that where the national interest is dominant, the state is powerless to regulate, even in the absence of federal legislation. See State of Kansas ex rel. Fatzer v. Sinclair Pipe Line Co., Kan.1956, 304 P.2d 930. I think these circumstances justify the exercise of the extraordinary federal equity remedy.